THE LEHIGH ZINC AND IRON COMPANY (LIMITED), appellants,

*v.*

CHARLES TROTTER, respondent.

43　185
50　　7
43　185
53　575
43　185
56　627
43　185
p66　444

1. Trotter, the owner of a leasehold estate in a vein of ore, contracted with the Lehigh Zinc and Iron Company to deliver one thousand tons of ore per month. The contract provided that if at any time during the continuance of the contract Trotter should fail for thirty days to deliver the monthly quantity of ore, the company might, after notice, take possession of the mine, machinery, tools &c., and take therefrom the amount of ore specified, charging Trotter the cost of mining and delivering the same, with a guaranty by Trotter that the company should have peaceable possession of the mine until the inability or failure of Trotter to supply ore as agreed upon should be satisfactorily removed.—*Held,* that the contract gave the company the right to possession of the mine to work the same if from any cause Trotter should fail for thirty days to deliver ore in conformity with the terms of the agreement, and gave to Trotter the right to possession again in case his inability or the cause of such failure was removed.

2. A court of equity will decree possession of real estate as auxiliary relief, but will not make a decree upon the right of possession, and order possession to be given where the right of possession depends upon a legal question, unless there are special circumstances laying the foundation for equitable interposition.

3. An objection to the jurisdiction of the court, on the ground that there is a perfect remedy at law, is not such an objection to the jurisdiction that a party is entitled to have it allowed at any stage of the cause. The court, of its own motion, may dismiss a bill on that ground, but the objection, to be available to the party, must be taken by demurrer or insisted upon in the answer.

On appeal from a decree advised by Vice-Chancellor Bird.

In 1881, Trotter was in possession of a leasehold estate in a mine, vein or bed of franklinite ore, situate at Franklin, Sussex county, New Jersey, under a lease made by one James L. Curtis, bearing date March 6th, 1877, for the term of thirty years. By an indenture under seal, made June 2d, 1881, Trotter covenanted to deliver to Heckscher twelve thousand tons of franklinite ore

in monthly shipments of one thousand tons or thereabouts. The agreement is set out in full in the report of the case of *Trotter* v. *Heckscher, 13 Stew. Eq. 612–645.*

The agreement, though made with Heckscher individually, was really for the benefit of individuals who afterwards associated themselves and formed a corporation under the name of the Lehigh Zinc and Iron Company (Limited), which engaged at Bethlehem, Pennsylvania, in the manufacture of oxide of zinc, and the production of a mixture of iron and manganese known as spiegeleisen. On the 6th of August, 1881, Heckscher assigned the agreement to this company. Ore such as was taken from the vein to which this mine belonged was indispensable to the operation of the company's works, and a regular supply was necessary in the business.

The agreement gave Heckscher, his associates and assigns, the option, at the expiration of the twelve months, of taking thereafter the same monthly quantity of ore for the remainder of the term of the lease under which Trotter held, or for a less time, upon giving notice in writing to that effect, and also the first option of purchasing on the same terms ore that Trotter might take from any adjoining mine or vein of which he might thereafter obtain possession.

On May 10th, 1882, the zinc and iron company gave notice in writing of the election to take a minimum quantity of twelve thousand tons per annum, in regular monthly instalments, for the remainder of the term of Trotter's lease, to wit, until March 6th, 1907.

The ore was to be delivered by Trotter on board railroad cars at Franklin. The price to be paid was $3.75 per ton for every ton of ore containing by assay twenty-six per cent. of oxide of zinc, and a further sum of fifty cents per ton for every ton containing an additional one per cent. of oxide of zinc, or a proportional part of fifty cents for any fractional percentage in excess of the twenty-six per cent. The agreement also stipulated that Heckscher, his associates and assigns, should not be compelled to take or pay for any ore containing less than twenty-six per cent. of oxide of zinc, with proviso that if the said mines should

Lehigh Zinc and Iron Co. *v.* Trotter.

be incapable of producing the quantity of ore required by the agreement of at least twenty-six per cent. of oxide of zinc by assay, but should be capable of producing an inferior quality of ore, Heckscher, his associates and assigns, should have the privilege of taking any quantity of the said inferior ore at such rate as might be agreed upon between the parties, such price not to exceed $3.75 per ton, or the market value of said ore as mangan iron ore. Vice-Chancellor Bird and this court applied the same sliding scale downwards in estimating the price of ore containing less than twenty-six per cent. of oxide of zinc which the agreement designated for estimating the increased price of ore in excess of that percentage, until in the descending scale the market price of such ore as mangan iron ore should be reached. *Trotter* v. *Heckscher, 13 Stew. Eq. 631–654.*

In the tenth subdivision of the agreement it was stipulated that Heckscher, his associates or assigns, should have full power and authority to enter upon the mines and premises therein mentioned, and inspect and examine the same, and provide, if it should be necessary, such security and protection for the mines and their proper working, as to Heckscher, his associates or assigns, should seem fit and proper.

The fourth subdivision of the agreement is in these words:

"That if at any time during the continuance of this agreement the said Charles W. Trotter, his heirs, executors, administrators or assigns, shall fail for thirty days to deliver the monthly quantity of ore as above agreed upon, the said Charles A. Heckscher, his associates, executors, administrators and assigns, may, at his or their option, after thirty days' notice to the said Charles W. Trotter, take possession of the mine, vein, lode or bed of franklinite ore, and all machinery, tools and appliances necessary and required to be used in connection with said mine and works, and shall have the free and uninterrupted right and privilege of entering into and upon the said premises, and any and all parts thereof, and shall have the full and uninterrupted right and privilege of taking therefrom and applying the amount of ore above specified to his and their own use, charging to the said Charles W. Trotter the cost of said mining and the delivery of said ores on board the cars, he, the said Charles W. Trotter, paying for the same. And the said Charles W. Trotter hereby, for himself and his heirs, executors, administrators and assigns, guarantees that the said Charles A. Heckscher, his associates, executors, administrators and assigns, shall have peaceable and uninterrupted possession of said mine, vein, lode or bed of franklinite ore until the inability or failure of the said Charles

Lehigh Zinc and Iron Co. *v.* Trotter.

W. Trotter to supply said ore as agreed upon shall be satisfactorily removed. And during such occupation and working of said mine, vein, lode or bed of franklinite ore, the said Charles A. Heckscher, his associates, executors, administrators and assigns, shall have the privilege and right either to employ the workmen there engaged, or to dismiss them, or any of them, and employ others."

The delivery of ore under this agreement began in June, 1881. Early in May, 1882, Trotter stopped delivering ore, and on the 12th of May, 1882, the company served a notice in writing that it would, after the expiration of thirty days, take possession of the mine and works and all machinery, tools and appliances necessary and required to be used in connection therewith, and take from said premises, and apply to their own use, the amount of ore specified, according to the terms of the agreement, and exercise every right, power, privilege and authority given or implied under and by virtue of said agreement.

On the 8th of June, 1882, Trotter filed a bill in the court of chancery against Heckscher and the zinc and iron company, praying an injunction restraining them from taking such possession, and for an account, the construction of the agreement, and for direction as to the delivery and assay of ore under said contract, and for general relief. In this bill it was averred that disputes had arisen as to the quantity and quality of the ore delivered, and the *gravamen* of the complaint was the company's refusal to pay for ore delivered, whereby the complainant was greatly embarrassed in his circumstances.

Upon filing this bill, an interlocutory injunction was granted. To this bill the defendants filed an answer and also a cross-bill. In the cross-bill it was averred that the defendants were entitled to take possession of the said mine and appurtenances under said contract, and had the right to hold possession thereof until the inability or failure of the complainant to supply said ore as agreed upon should be satisfactorily removed, with a prayer that an order or decree be made directing the defendants to take possession of said mine, with the appurtenances, machinery, tools and appliances referred to in said contract.

On final hearing it appeared that there were disputes between

the parties as to the construction and meaning of the agreement, especially with respect to the manner in which the assay should be made, and as to the price to be paid for ore falling below the standard of twenty-six per cent. per ton. Upon final hearing the vice-chancellor made a decree that the complainant should have an account and payment for ore delivered before the bill was filed; that he was entitled to suspend deliveries of ore until such payment; and that the defendants were not entitled to the possession of the mine, they not having accounted or paid for ore theretofore delivered to them; and that the complainant was entitled to an injunction against their taking such possession, and to the continuance of the same unless and until order of the court to the contrary should be made.

On appeal this court reversed the decree of the court of chancery, and decreed that, Trotter having failed to make the stipulated deliveries of ore for thirty days, the defendants became entitled to the possession of the mine on the 11th of June, 1882, under the fourth clause of the contract, and that the record should be remitted to the court of chancery, to the end that the decree might be carried into execution. On application to this court to amend its decree, it was declared to be the opinion of this court that the effect of its decree was absolutely to dissolve the injunction restraining the defendants from taking possession of the mine, and to adjudge them to be entitled to the possession thereof, without prejudice to an inquiry after possession was taken into any change of the right of possession from matters arising since the bill was filed.

Upon the *remitittur* of this decree and the declaration of this court as to the effect thereof, the court of chancery, after reciting those proceedings, made its decree thereon " that the said injunction be dissolved, and that the said The Lehigh Zinc and Iron Company (Limited), are entitled to the possession of the mine mentioned in said pleadings, with the appurtenances thereto belonging, without prejudice to an inquiry, after the said The Lehigh Zinc and Iron Company has taken such possession, into any change in the right of possession arising since the bill was filed," and that all rights and equities between the parties

be reserved, and that either party should have the right to apply to the court for further relief.

BIRD, V. C.

, The question now presented for consideration arises upon a bill supplemental to one filed in May, 1882. That bill was filed, amongst other things, to restrain the defendants from taking possession of a certain mine named in the pleadings.

On appeal the court of last resort decided that the defendants were entitled to possession of the mine. The right to such possession and the ground upon which it was given was a clause in a contract between the parties to the effect that if Trotter should *fail* for thirty days at any time, during the continuance of said contract, to deliver ore from said mine, according to the quantity agreed upon, the said Heckscher might, at his option, after thirty days' notice, take possession of the mine and all machinery, and should have the uninterrupted right of entering upon the said premises and taking therefrom the amount of ore which Trotter agreed to deliver, charging Trotter with the cost of mining and delivering. The decree of the court of errors, besides providing that the defendants were entitled to possession of said mine, declared that their decree should be " without prejudice to an inquiry, after the said The Lehigh Zinc and Iron Co. (Limited), should have taken such possession, into any change of the right of possession from matters arising after the bill was filed." On May 6th, 1886, the defendants took possession of the mine, as they had a right to under said decree. The complainant immediately demanded possession to be redelivered to him.

This claim for the present right of possession of the mine by Trotter arises, not only under said decree, but also under the contract between the parties, which, among other things, provides, in addition to the provision that the defendants may take possession in case Trotter shall fail to deliver ore, and that " the said Charles W. Trotter, for himself, his heirs, executors, administrators and assigns, guarantees that the said Charles A. Heckscher, his associates, executors, administrators and assigns, shall have peaceable and uninterrupted possession of said mine, vein, lode

or bed of franklinite ore until the inability or failure of the said Charles W. Trotter to supply said ore as agreed upon shall be satisfactorily removed." The supplemental bill alleges that said inability of Trotter has been removed, and that he is now able to supply said ore according to the stipulations of his contract. It also presents a claim against the defendants for waste committed by them in the management of said mine since they have had the possession.

. The answer denies that the defendants are entitled to the possession of the mine only so long as the complainant may or might be unable to fulfill his contract, or that defendants are under any obligation to return and give up possession to the complainant as soon as the complainant's so-called inability or failure to supply said ore, as agreed upon, shall be removed.

As a question of fact, and independent of every other consideration, the defendants admit that the inability of Trotter to furnish the ores has been removed, and further say " that the complainant has lost his right of possession and working said mine under said contract, not by reason of any actual physical inability on the part of the complainant to furnish the quantities and quality of ore required by the contract, but from a willful and deliberate failure and refusal to deliver any ore at a time when there was no physical disability whatever existing to prevent it," and insist that the decree of the court awarding the possession to the defendants was founded upon such deliberate refusal, and not upon mere inability. The charge of waste is denied, and, on the contrary, it is insisted that the method of mining has been materially improved and the expenses thereof greatly reduced. Besides the claim for possession and the charge of waste, the complainant asks for the appointment of a manager.

First, is the complainant entitled to the possession of the mine, or has he forfeited all right thereto by some inequitable or unconscionable act? Trotter ceased to deliver ore in May, 1882, not because he had not the means or was in any sense physically unable, but because the defendants refused to pay him over $30,-000 which he insisted was then due upon the contract for ores already delivered. The original bill, besides asking for an in-

junction against the defendants, prayed for an accounting. There was an account taken, but instead of Trotter recovering over $30,000 there was found to be due to him only $5,793.71 at the time he refused to deliver ore. Was it inequitable for him to refuse to deliver ore under the contract so long as defendants refused to pay under the contract? There was no offer to pay the $5,793.71 found to be due by the court, until after the decree.

In determining whether or not Trotter forfeited his right to manage the mine himself, under the contract, a few of the principal facts must be kept before the mind. Trotter was a resident of New York. He was the owner of a lease of this mine embracing a term of thirty years. He was under obligations to his lessors and accountable to them for the profits of the mine by way of rental. It was most natural for him to insist upon just compensation according to the contract, presumably, that had been provided for, and equitably, it might be insisted upon.

The defendants resided in Pennsylvania; they were without the jurisdiction of the state of New York, where Trotter resided, and of the state of New Jersey, the place where the mine is located and where all the mining operations were carried on by Trotter. The consideration-money was to be paid on the 15th day of each month for all the ores delivered during the month immediately preceding, so that the refusal to pay on the part of the defendants did not arise from any surprise, for by the contract they had ample time therefor. Their refusal to pay was as deliberate as the refusal of Trotter to deliver ore. While, at first, the defendants only made the assays, upon the basis of which the payments were made, after a short time the complainant, becoming dissatisfied with the results of defendants' work, began to take samples and to make assays, the result of which tended to show that the ore was vastly richer than the assays of the defendants proved it to be. The difference in value of a given quantity then unpaid for was as the difference between $5,000 and $30,000. This resulted in the disagreement respecting the amount due. Trotter insisted that the defendants made erroneous assays, and he claimed, as stated, that there were over

$30,000 due him, which the defendants absolutely refused to acknowledge. The one refused to pay and the other to deliver.

There was no inability upon the part of Trotter either to produce or to deliver the ore. The contract provides that if Trotter shall *fail*, then Heckscher may take possession. In the same paragraph, but in a different sentence, Trotter guarantees that Heckscher shall have peaceable and uninterrupted possession until the *inability or failure* of Trotter to supply ore shall be satisfactorily removed. It will be perceived that Trotter's failure to deliver ore arose, not from inability, but from a mere naked refusal. Did this work a forfeiture of Trotter's right to conduct these mining operations? In other words, should a court of equity say that it was his duty to deliver ores according to the contract, notwithstanding the defendants refused to pay according thereto, and that he must rely upon his action at law for the amount due or for damages for any breach? I think the general rule at law goes to this length. See *Blackburn* v. *Reilly, 18 Vr. 290,* in which case the court of errors and appeals declares that "in contracts for sales of goods, to be executed by a series of deliveries and payments, defaults of either party with reference to one or more of the stipulated acts will not, ordinarily, discharge the other party from his obligation, unless the conduct of the party in the fault be such as to evince an intention to abandon the contract or a design no longer to be bound by its terms."

A forfeiture often results, in case of a breach of contract, from the enforcement of the strict rules of law. There may be forfeitures in equity, or what is equivalent thereto in many cases, a party may be estopped by his conduct from setting up a claim or a right which otherwise would be regarded as highly equitable.

I do not think that either a forfeiture or an estoppel has arisen. It seems to me that Trotter has not been guilty of any breach, either at law or in equity. He failed to deliver ore and the contract provided for such failure. Nothing whatever is said or intimated, in the first provision of the paragraph referred to, about causes for such failure. Being under only such obligations, Trotter said to the defendants, in effect, "I am ready and willing to perform this contract if you are." It is true Trotter

demanded more than was due, but it is equally true that the defendants neither paid nor tendered the amount that was actually due; so that the responsibility for the first refusal did not rest entirely with Trotter. Trotter did not abandon the contract, nor is there any evidence of any purpose on his part to rid himself of its obligations, except by honestly discharging them. On the contrary, I find that he immediately filed the original bill in this cause and sought the aid of this court in his endeavors to comply with his legal obligations, submitting himself to the direction of the court in that behalf. His bill shows there were indeed serious disagreements between the contracting parties; and this will more satisfactorily appear by an examination of the opinion of the court of errors and appeals, *supra*. The answer and cross-bill show that the differences between the parties had become so many and so aggravated by repeated altercations that a mutual settlement seemed impossible. Amongst other things, the complainant asked for the money due to him on his contract; the defendants asked, amongst other things, for the possession of the mine; the court awarded Trotter over $5,000, but gave the possession of the mine to the defendants.

But supposing Trotter to have been guilty of a breach, it by no means follows that because the court gave him the consideration for his ore, and the defendants possession, that it intended to apply the doctrine of forfeiture, nor did it declare that either party was estopped.

It is my judgment that, when a contract expressly provides that in case one party fails to perform such contract the other party may perform it for him and charge him with the costs, also provides that he may continue such performance until the failure or inability of the other contracting party shall be satisfactorily removed, such failure does not amount to a forfeiture nor work an estoppel, unless bad faith be clearly shown. There was no intention when the contract was entered into that Trotter's failure to mine and deliver ores should terminate his right to mine. Indeed, the contrary is to be inferred most plainly from the contract. This view of the case seems to me conclusively against the contention of the defendants. Beyond

doubt, the defendants understood this contract as the court now does, for what is now urged with the greatest amount of learning and elaboration was not heard of until the filing of the answer to this supplemental bill, although the original answer and cross-bill had been filed four years before.

Secondly, as to the claim for waste, is there any substantial merit in it? I think not. When all the facts are considered, I cannot conclude that Trotter has been at all injured, in a sense of injury arising from a breach of contract. Trotter says that he has suffered loss in that defendants mined and shipped ore altogether too far below in value that contemplated by the contract, thereby greatly diminishing his receipts, since he is entitled to $3.75 per ton for all ores yielding twenty-six per cent. of the oxide of zinc, and fifty cents for every additional per cent. or fractional part thereof above twenty-six. The testimony shows that such ore as the complainant condemns was shipped by the defendants. And I think that the contract does not, in any sense, contemplate that the traffic between the parties shall be carried on in such ores. The contract expressly provides that it shall be at the option of defendants to accept of ore assaying less than twenty-six per cent. Hence, to deliberately take some ore very rich, say containing thirty-five per cent. of zinc, and a like quantity of material containing only twenty per cent. or less, in order, by mixing, to bring down the price of the good ore from $8.75 to $3.75, would be a palpable violation of the plain spirit and meaning of the contract, and a very gross fraud on the complainant. But, nevertheless, the contract itself makes it very clear that the parties considered the possibility of Trotter shipping ores containing less than twenty-six per cent. of zinc, and certainly, if he might perchance do so, it is not unlikely the defendants might do likewise. Therefore, unless it appears that the defendants intended to violate the spirit and meaning of the contract, either by direct proof or a course of practice in mining leading to that end, they cannot be charged with waste. Whilst there has been some such ore shipped by the defendants since they have had possession, neither of the conditions which I think requisite to hold them has been established.

Again, it is claimed that great waste has been committed in the general management of the mine by the defendants; that is, in abandoning one or more shafts which had been sunk and used by Trotter; in sinking one of them several feet deeper than it was or than was necessary for proper developments, and then allowing it to fill with water; in weakening pillars necessary for the support of overhanging walls; in not making necessary developments to insure successful mining; in robbing stopes of rich ore which had been reserved for unexpected emergencies.

The affidavits submitted on either side cannot be read without observing that the method pursued by the defendants is, in many particulars, quite different from the one pursued by Trotter. Which method is the better is earnestly disputed. Experts of the highest character have been sworn on both sides. I find no reason whatever to question either their ability or their integrity, or that each one had a full opportunity to know all that was necessary of this mine to speak intelligently. There is no decided preponderance of testimony on either side. I certainly cannot make up my mind that such preponderance is with the complainant, on whom rests the burden. Like so many of the affairs of the business world, the better way to manage this mine seems to be open to dispute, and, as is often the case in other pursuits, different methods produce equally favorable results. I think the charge of waste has not been sustained.

The complainant asks for the appointment of a manager, with power to superintend and control all these mining operations, under the directions of the court. I am not disposed to look upon this prayer with favor. Above all, it seems to me that in the attitude which the decree already foreshadowed will leave the complainant, he will be in no position to insist on this prayer. Indeed, I think he ought not to ask it. It strikes me with no little force that it is a confession of unfortunate weakness and of inability to carry out the contract on his part which he has made. Why should he come in and ask the interference of this court, from day to day, in these mining operations under his contract? He has contracted to do the work. And the contract provides that if he fails, the other party may take possession

and do the work, charging all costs to Trotter, without any change in the consideration paid for the ore. Just the condition expressed in the contract and provided for has already arisen and is now before us.

The defendants have been trying their hand at mining, and the complainant is very much dissatisfied with the experiment. Now, it is proposed to let the complainant try again. Why not let him try it fully and without interruption, in the spirit of the contract? Why should the court doubt his ability? Why should he suggest so grave a doubt of his own ability, when with the same breath he asks that the defendants may be turned out? Let him try again. And until the other side comes and shows injury to itself by the complainant's inability or failure, the court will hesitate long, and be sure of an extraordinary case, before it interferes.

The defendants' counsel raised a question of jurisdiction, insisting that this court had no power to turn one citizen out of possession and to put another in, claiming that the issues in such cases can only be tried by actions of ejectment before a jury. No doubt has crossed my mind as to the power of this court to proceed with this case. It is not a new suit by way of ejectment. The suit was instituted for other and for different purposes. It was instituted to retain the possession by the complainant as against the defendants, and for an account. With those ends in view, it has been progressing for more than four years. The defendants came in by answer and by cross-bill. The court has made many orders, and one or more, I think, at the instance of the defendants themselves. At length came the final decree, after a hearing and great consideration in the court of errors and appeals, under which the defendants went into possession. And now comes this supplemental bill, by which is raised the issue whether the complainant is not at this time entitled to the possession.

It is quite plain that this court has jurisdiction; it is quite plain that for it to proceed is no assumption. It is according to the practice of the court in making effectual its final decrees. Such practice, in this case, would not be unlike the practice of

awarding writs of assistance in many foreclosure cases, or like enforcing its decrees in cases of specific performance. In this case, the court of errors and appeals said that the decree awarding to defendants possession should not prejudice the right of Trotter to make inquiry as to his rights to be let in. I can conceive of no grounds for thinking that that tribunal intended to turn these parties over to another tribunal, that all of the questions involved in this branch of the controversy should be heard anew.

I think the complainant is entitled to the possession of the mine, but not to an account for waste, nor to a manager; he is entitled to costs.

*Mr. C. B. Thompson, Mr. H. C. Pitney* and *Mr. George Northrop,* for appellants.

*Messrs. Cortlandt & R. Wayne Parker, contra.*

The opinion of the court was delivered by

Depue, J.

The decree in the original suit upon the *remittitur* was entered in the court of chancery May 4th, 1886, and on the 6th the company took possession of the mine. On the same day Trotter gave notice that all inability or failure to furnish ore under said contract had been removed, and demanded that possession of the premises should be delivered back to him. The company having refused to surrender possession, Trotter thereupon, August 24th, 1886, filed the present bill. The object of the bill is to obtain by a decree of the court the restoration of the premises to the complainant. On final hearing in the court of chancery it was decreed that by the true construction of the agreement the complainant was entitled to a return of possession so soon as his inability or failure to supply the ore mentioned in the agreement was satisfactorily removed, and that, such inability and failure having been removed, the possession of the said mine, together

with the machinery, tools &c., should be redelivered to the complainant. From this decree the defendants appealed.

Trotter, in virtue of his leasehold estate, is the owner of the mine in question. As an incident of his ownership he is primarily entitled to the possession of the premises and to the use and enjoyment of the same, to work the mine in such a manner as would conduce to his own interests. He contracted to mine and deliver to the company, on cars at Franklin, the ore taken from the mine, in certain monthly quantities specified in the agreement. To secure to the company a regular supply of ore, in the quantities and at the times set out in the agreement, power and authority were conferred upon the company to enter into and upon the mines and premises, to inspect and examine the same, and provide, if necessary, such protection and security for them and their proper workings as to the company should seem fit and proper, and also the free and uninterrupted right and privilege to enter into and upon said premises and any and all parts thereof, and to take therefrom and apply to their own use the amount of ore specified in the agreement in case Trotter should fail, for thirty days, to deliver the monthly quantities of ore stipulated—charging Trotter with the cost of mining and delivering upon the cars—with the privilege and right, during such occupation and working of the mine, to employ the workmen employed by Trotter, or to dismiss them and employ others, and also to take possession of and use the machinery, tools &c. belonging to Trotter which were required to be used in connection with the mine and works.

The agreement evinces no intent to assign Trotter's leasehold estate to the company in any event. The operative words are "right and privilege" to enter upon and work the mine and take therefrom ore at Trotter's expense, to be applied in fulfillment of his contract. The purpose the parties had in view in adopting such a provision was to insure the supply of ore in regular monthly quantities which were necessary to the operation of the company's works. During the company's possession of the mine Trotter would be deprived of the advantage of selecting and overseeing the workmen employed and of supervising the expenses of mining and loading the ore, and especially of the advantage

which would ensue from directing how the mine should be worked and the ore be delivered under the contract. The sliding scale of prices above and below the standard of twenty-six per cent. fixed by the contract exhibits a striking illustration of the benefit Trotter would have in controlling the working of the mine and selecting the ore for the monthly shipments. It is obvious that the parties contemplated that the privilege granted to the company of exercising those rights which naturally belong to Trotter as the owner of the mine, and as the party who had contracted to mine and deliver the ore, should subsist so long only as the exercise of such a right was necessary to effectuate the purpose the parties had in view in making this provision part of their agreement. The period of the duration of this "right and privilege" is defined in the agreement to be "until the inability or failure of the said Charles W. Trotter to supply said ore as agreed upon shall be satisfactorily removed."

The contract gave the company the right to the possession of the mine; to work the same if from any cause Trotter should fail for thirty days to deliver ore in conformity with the terms of the agreement. It also gave to Trotter the right to possession again in case his inability or cause of such failure should be removed. This was the construction of the fourth subdivision of the agreement adopted by the vice-chancellor. It is the construction put upon it by the defendants in the cross-bill filed by them in the former case. It is the construction which conforms to the language of the agreement, and also gives effect to the intention of the parties as disclosed by their contract taken as a whole.

Nor is it made apparent that Trotter has by his own conduct forfeited his rights under the contract. His refusal to deliver ore in accordance with the terms of the agreement, which gave rise to the former litigation and to the company's right to have possession, was due, in a great measure, to his misconstruction of terms of the contract obscurely expressed with respect to the manner of assaying the ore, and a misapprehension of his legal right to withhold delivery for the reason that ore delivered had not, as he construed the agreement, been paid for as prescribed by its terms. The vice-chancellor in the former decree sus-

tained his contention and decreed in his favor.  In this court, both parties were found in fault—the company, in not making payment for ores delivered, as required by its contract (a default which was due to mistakes in analyzing the ores and to the indefiniteness of the contract with regard to the price of ore below the standard) ;—Trotter, in assuming that neglect to pay for ores in strict compliance with the terms of the agreement gave him the right to refuse to go on with the delivery of ore.  In the controversies which culminated in this litigation, the parties have been in dispute as to the construction of the agreement, and since the dispute began each has shown a purpose to grasp every legal right conferred by the agreement ; but there is no ground for the conclusion that either party intended to repudiate the contract.  There might possibly be circumstances which would induce a court of equity to deny to Trotter the possession of the mine, but a case requiring such a measure of redress has not been presented.  The rights of the parties in the premises rest upon contract.  The contract, which by one of its terms gave the company a right to possession of the mine in case of Trotter's failure for thirty days to deliver ore as he had agreed to do, by another term gave Trotter a right to have possession again when his inability, or the cause of his failure to supply ore as agreed upon, should have been removed. Trotter, in this bill, declares his willingness to go on with the delivery of ore as he had agreed to.  He also avers his ability to do so.  On that subject, the proof furnished by the schedule of deliveries from April, 1882, to May, 1886, is entirely satisfactory.  Indeed, the defendants, in their answer, admit the complainant's ability to furnish ore in the quantity and of the quality required by the contract.  They put their defence to this proceeding on the ground of a forfeiture by Trotter of his right of possession by reason of his willful and deliberate failure and refusal to deliver any ore at a time when there was no physical disability to prevent it—a defence the validity of which is not sustained.

The defendants contend also that the complainant has an adequate remedy at law to recover possession, and that therefore the

bill should be dismissed. The rights of the parties with respect to the possession and the working of the mine for the purpose of fulfilling Trotter's agreement to deliver ore are expressed in the form of a covenant. We do not, at this time, deem it necessary to consider whether Trotter might have a remedy at law, or the form in which the legal remedy should be pursued.

The first bill filed by Trotter was simply an injunction bill to restrain the defendants' entry. The defendants, not content with an answer to the bill, filed a cross-bill, in which they set up their right to take and hold possession of the mine until the inability or failure of the complainant to supply ore as agreed upon should be satisfactorily removed, and prayed that an order and decree might be made directing them to take possession of the mine, and that an injunction should issue to restrain Trotter from disturbing their possession. In the opinion of this court, which was carried down to the court of chancery with the *remittitur*, it was declared that the effect of our decree was to dissolve the injunction enjoining the defendants from taking possession of the mine, and to adjudge them to be entitled to the possession thereof, without prejudice to an inquiry, after the defendants had taken possession, into any change of the right of possession from matters arising since the bill was filed. In its decree upon the *remittitur* the court of chancery recited the decree of this court, together with the explanatory opinion annexed to it.

The court of chancery, in executing the decree of this court, made a decree dissolving the injunction which restrained the defendants from entry and taking possession of the mine. Such a decree would have disposed of the litigation inaugurated by the complainant's bill. It was the only decree in favor of the defendants which was in this respect within the scope of the complainant's bill. Such a decree would simply have withdrawn the restraining hand of the court of chancery, and would have left the defendants to enter at their peril or to obtain possession at law. But the court went further. It gave an affirmative decree in favor of the defendants, adjudging that they were entitled to the possession of the mine—a decree enforceable in the manner in which a court of equity enforces decrees establishing a party's

right. To this part of the decree a limitation was annexed that the possession adjudged should be without prejudice to an inquiry, after possession was taken, into any change of the right of possession from matters arising since the bill was filed. It was also made part of the decree that all rights and equities between the parties be reserved, and that either party have the right to apply to the court for further relief. Under this decree the complainant gave up, and the defendants obtained, the possession of the mine.

It is manifest that these proceedings were conducted throughout upon the assumption that the equity court had cognizance of the possession and the change of possession of the mine provided for by the fourth subdivision of the parties' agreement. The defendants' cross-bill was filed in that aspect. The decree upon the *remittitur* was framed upon that idea. Possession of the mine was adjudged to the defendants without prejudice to an inquiry into any change of the right of possession from matters arising after the bill was filed—a mode of trial which imports an investigation in the equity court rather than by suit at law. By the decree all rights and equities between the parties were reserved, and leave was given to either party to apply to the court for further relief. The purpose of the equity court to retain hold of the litigation until inquiry should be made into a subsequent change of the right of possession is exhibited by the decree. The decree is in force, unappealed from. Whether in strict practice such an inquiry should not have been made upon petition we do not propose to discuss. The vice-chancellor, on the defendants' motion, dismissed a petition filed by the complainant for that purpose. The dismissal was on the ground that the matter should be brought before the court by a bill. *Trotter* v. *Heckscher, 14 Stew. Eq. 478.* In the opinion sent up with this record the bill is treated as a supplemental bill. It is rather an original bill in the nature of a supplemental bill, such as is sometimes brought in aid of a decree, to carry out and give full effect to the decree. *Story's Eq. Pl.* §§ *336, 338, 345, 346; 2 Dan. Ch. Pr. 1536, 1573 and notes; Dormer* v. *Fortescue, 3 Atk. 124, 133; Hodson* v. *Ball, 1 Phil. 177, 181.* As such it is not inappropriate to an

investigation of this character. The bill was framed in that aspect. It sets out the proceedings in the original suit and the decree made therein, and avers that after the filing of the original bill all such inability and failure had been satisfactorily removed, and that by reason of said decree demand was made by Trotter that possession be restored to him. If the bill was defective in substance the defendants should have demurred. *2 Dan. Ch. Pr. 1534, 1535.* If it was filed irregularly, they should have moved to dismiss, or the court in its discretion might have dismissed it. *Barriclo* v. *Trenton Mutual Life Ins. Co., 2 Beas. 154, 159.*

The bill was not demurred to, nor was any motion made to dismiss it. Answers were filed, and in the answers no objection was taken to the complainant's proceeding by bill, or to the jurisdiction of the court to grant the relief prayed. On the contrary, the company, in its answer, set up a right to retain possession, and set forth *in extenso* the facts and circumstances on which its claim to retain possession rested, and, in express terms, submitted its rights in the premises to the consideration of the court of chancery. The case was put at issue. Depositions were taken. No objection was made to the mode of procedure, nor to the jurisdiction of the court until final hearing. The objection that the complainant had an adequate remedy at law came too late to avail the defendants. The court, of its own motion, may dismiss a bill at any stage of the cause, on the ground that the complainant has an adequate remedy at law. But where the defendant has not raised the objection until after testimony on the merits has been taken, the court, in its discretion, will retain the cause, if the court is competent to grant the relief prayed, and has jurisdiction of the subject matter. *Bates* v. *Conrow, 3 Stock. 137; Gifford* v. *Thorn, 3 Hal. Ch. 90; Seymour* v. *Long Dock Co., 5 C. E. Gr. 396; Cutting* v. *Dana, 10 C. E. Gr. 265; Palys* v. *Jewett, 5 Stew. Eq. 302; Parker* v. *Winnipiseogee Co., 2 Black 545; Cumming* v. *Mayor of Brooklyn, 11 Paige 596; Clark* v. *Flint, 22 Pick. 231; 1 Dan. Ch. Pr. 550 and note.*

A court of equity will decree possession of real estate as auxiliary relief, but will not make a decree upon the right of pos-

session, and order possession to be given where the right of possession depends upon a legal question, unless there are special circumstances laying the foundation for equitable interposition. *Crane* v. *Conklin, Sax. 346 ;* *Mead* v. *Camfield, 3 Stock. 38 ;* *Miller* v. *Jamison, 9 C. E. Gr. 41 ;* *2 Spence's Eq. Jur. 845.* Special circumstances may exist to justify a court of equity in exercising jurisdiction over the right of possession. Jurisdiction is not infrequently exercised to decree possession in controversies between trustees and *cestui que trust* in specific performance, and suits for setting aside deeds of conveyance in partition, and cases of disputed boundaries &c., and orders for possession are often made in foreclosure suits. *Harrison* v. *Rowan, 4 Wash. C. C. 202 ; Devaucene* v. *Devaucene, 1 Edw. Ch. 272 ; 1 Pom. Eq. Jur.* § *185 ; Fackler* v. *Worth, 2 Beas. 395 ; Schenck* v. *Conover, Id. 220.* An order of this character, when made by a court of equity, is enforced by writ of assistance, or proceedings for contempt. *2 Dan. Ch. Pr. 1062 and note.* Precedents of this mode of procedure are furnished by the practice in suits for the foreclosure of mortgages. *Thomas* v. *De Baum, 1 McCart. 37 ; Schenck* v. *Conover, 2 Beas. 220.*

In *Palys* v. *Jewett, 5 Stew. Eq. 302,* this court retained the cause and proceeded to adjudge a purely legal right, and gave damages thereon against a receiver, upon the *scintilla* of jurisdiction conferred by the order of the chancellor allowing a suit for such a cause of action to be brought in the equity court. In *Gawtry* v. *Leland, 13 Stew. Eq. 323,* this court affirmed *sub silentio* a decree deciding the complainant's legal rights in defendant's lands where the legal remedy was adequate. In *N. J. Zinc Co.* v. *Boston Franklinite Co., 2 Beas. 322–350,* Chancellor Green, at the request of parties, entertained jurisdiction over a legal right in lands, and this court reheard the case on the merits. *2 McCart. 418.* In *Hart* v. *Leonard, 15 Stew. Eq. 416,* this court, on its own motion, dismissed a bill on that ground, the objection not having been taken by the parties. The party not interposing the objection at the proper time, the matter is in the discretion of the court.

Heckscher, in March, 1883, and after the bill in the original cause had been filed, became, by purchase, the owner of the fee in the mine, subject to Trotter's rights under the lease. He holds title in the reversion for the benefit of the company. The case shows the advantage that may be taken of Trotter in the selection and combination of ore of different grades of quality in the delivery of ore under the contract. The vice-chancellor comments on that fact in his opinion. As a contracting party, the company's interest in this respect is adverse to the complainant. It may also be presumed that in working the mine the company will be interested in conserving its own interests in protecting the reversion rather than the interests of Trotter as tenant. And all these things may be done without affording Trotter legal redress for the injury.

On the merits the case is with the complainant. Under such circumstances that objection to the mode of proceeding, and to the jurisdiction, if well founded, ought not to be sustained.

The decree should be affirmed.

*Decree unanimously affirmed.*